UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:08-CV-312 PPS ) |
| DONALD E. NOKES, JR., PATRICIA ANN NOKES, STEVEN DAVIS, BRANDON PHELPS, NATHAN EVANS, STATE OF INDIANA, PORTER COUNTY DEPARTMENT OF FAMILY AND CHILDREN, STARKE COUNTY DEPARTMENT OF FAMILY AND CHILDREN, JANET CARLSON, JADE PALIN, and KATHLEEN HANNON, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Nathan Evans claims in a state court complaint that he was sexually abused while in the custody of his foster parents, Donald and Patricia Nokes. In this insurance coverage dispute, brought by way of a declaratory judgment, State Farm says that it has no duty to defend or indemnify the Nokes or anyone else involved in Evans' state court case. State Farm now seeks summary judgment [DE 100]. Because Evans' is an insured under the policy issued by State Farm, and the policy explicitly excludes coverage for injuries to an insured, State Farm's Motion for Summary Judgment is **GRANTED**.

### BACKGROUND

The following facts are undisputed. Since 1975, Defendants Donald and Patricia Nokes have been licensed foster parents in the State of Indiana. [DE 105-1 at 42.] Defendant Evans

was the Nokes' foster child from 1996 to 2002, living with the Nokes about three-fourths of the time over that five and a half year period. (Evans sometimes stayed with his mother on weekends). [DE 102-11 at 30-15-31:11; DE 105-2 at 27:20-28:20.] Evans lived with the Nokes from the age of nine to fifteen, [DE 102-11 at 9:15], and he struggled with mental health issues during that period, [DE 102-11 at 27:25-28:5; 29:7-15]. Defendant Steven Davis also lived with the Nokes as a foster child for over five years, and Defendant Brandon Phelps was the Nokes' foster child for about a year. [DE 102-11 at 10:6-11:5, 20:22-24.] As foster parents, the Nokes were responsible for the daily care of the children, which included feeding, clothing, sheltering, supervising, and disciplining them. [DE 101 at 4.] The Nokes were also responsible for taking their foster children to school, counseling, and doctor visits. [*Id*.] Each of the foster children shared a room with another child where they kept their clothes, toys, and personal belongings. [*Id*.]

Throughout the period relevant to this suit, the Nokes had a homeowner's insurance policy with State Farm which provided that State Farm would pay for claims "brought against an insured for damages because of bodily injury . . . caused by an occurrence." [*Id*. at 5.] Importantly, the policy excluded coverage for "bodily injury to . . . any insured." [*Id*. at 6.] An insured is defined as "you [the Nokes] and, if residents of your household, any other person under the age of 21 who is in the care of a person described above." [*Id*. at 5.] It also excludes bodily injury "which is either expected or intended by an insured." [*Id*. at 6.]

Evans filed a complaint in Indiana's Porter Superior Court alleging that he was sexually molested by Phelps and physically abused by Davis while they were all foster children living with Mr. and Mrs. Nokes. [DE 102-1.] Evans, Phelps, and Davis were all under 21 years of age

at the time Evans was allegedly abused. [DE 101 at 3.] The state court complaint alleges that the Nokes, Phelps, Davis, Porter County Department of Family and Children, Starke County Department of Family and Children, the State of Indiana, and Porter County employees Janet Carlson, Jade Palin, and Kathleen Hannon violated Evans' civil rights under 42 U.S.C. § 1983, and that the negligence of many of these defendants (all but the alleged abusers, Phelps and Davis) caused the abuse. [DE 102-1.] This was not the first time one of the Nokes' foster children was accused of sexual abuse; State Farm had defended a previous lawsuit against the Nokes brought by a visitor to their home who claimed to have also been the victim of sexual abuse at the hands of one of the foster kids. [DE 105-11.]

As a result of Evans' suit, State Farm brought this declaratory judgment action against all parties named in the state court complaint. [DE 30.] State Farm seeks a judgment declaring that, pursuant to the Nokes' State Farm homeowner's insurance policy, it owes no duty to defend or indemnify the Nokes or any other insured, and no duty to any other defendant, relating to Evans' state court complaint. The Nokes, Evans, and Davis (which for simplicity's sake I will refer to collectively as "Defendants") filed separate responses to the motion, claiming that the Nokes' State Farm policy provides coverage for Evans' injuries, and, in any event, State Farm waived or

is estopped from denying coverage.[1]

**DISCUSSION**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Insurance contracts are subject to the same rules of construction as other contracts. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985). As a result, the interpretation of insurance contracts is primarily a question of law for the court. *Wagner v. Yates*, 912 N.E.2d 805, 808 (Ind. 2009). When interpreting an insurance policy, the court's goal is to determine the parties' intent as manifested in the insurance contract. *Burkett v. Am. Family Ins. Grp.*, 737 N.E.2d 447, 452 (Ind. App. 2000). The court will give the language of the insurance policy its plain and ordinary meaning if it is clear and unambiguous. *Id*. A provision is ambiguous if it is susceptible to more than one reasonable interpretation. *Am. Family Ins. v. Globe Am. Cas. Co.*, 774 N.E.2d 932, 935 (Ind. App. 2002). But the mere fact that the parties disagree as to the interpretation of the policy language does not create an ambiguity. *Id*.

**A.     The Nokes' State Farm Policy Does Not Cover Evans' Claims**

The State Farm policy that was sold to Mr. and Mrs. Nokes specifically excludes coverage for "bodily injury to you or any insured." [DE 101 at 6]. So if Evans is an "insured"

---

[1] Phelps, Porter County Department of Family and Children, Starke County Department of Family and Children, the State of Indiana, Carlson, Palin, and Hannon failed to answer State Farm's complaint. On January 19, 2010, the Clerk entered default against these Defendants. [DE 81.] And while I denied State Farm's motion for default judgment because of the possibility of inconsistent results, I granted State Farm leave to re-file its motion if judgment is reached against the remaining Defendants. [DE 90.]

under the policy, the injuries he asserts in his state court complaint plainly are not covered. The policy defines an insured as "you [the Nokes] and, if residents of your house, . . . any other person under the age of 21 who is in the care of a person described above." [*Id*. at 5.] The parties agree that Evans was under the age of 21 at the time of his alleged injuries. Thus, the issues here are whether Evans was a "resident" of the Nokes' house and whether he was "in the care" of the Nokes at the time of his injuries.

I first address whether Evans was a resident of the Nokes' home. For starters, the term "resident" in insurance contracts is unambiguous. *Indiana Farmers Mutual Ins. Co. v. Imel*, 817 N.E.2d 299, 304 (Ind. App. 2004). While "resident" has no fixed or precise meaning in law, courts in Indiana look to whether an individual has "maintained a 'fixed abode' in the household for some continuous amount of time." *Allstate Ins. Co. v. Shockley*, 793 F.Supp. 852, 856-57 (S.D. Ind. 1991) (quoting *Allstate Ins. Co. v. Neumann*, 435 N.E.2d 591, 593 (Ind. App. 1982)). In making this determination, I must look to: (1) whether the claimant maintained a physical presence in the insured's home, (2) whether he had the subjective intent to reside there, and (3) the nature of his access to the insured's home and its contents. *Imel*, 817 N.E.2d at 304. I must analyze these factors by taking into account the totality of the circumstances. *Allstate Ins. Co. v. Lawrence*, 2010 WL 4386780, at *4 (S.D. Ind. Oct. 27, 2010) (citing *Alexander v. Erie Ins. Exchange*, 982 F.2d 1153, 1158-59 (7th Cir. 1993) (applying Indiana law)). Notably, a resident "need not be a permanent member of the household, and in fact can be the resident of another household at the same time, but must be more than a transient." *Shockley*, 793 F.Supp. at 856; *see also Neumann*, 435 N.E.2d at 593 ("When used as a term to distinguish from both transient status and domicile, 'resident' may be said to refer to one having a fixed abode but only for the

time being.").

Here, Evans resided with the Nokes during the relevant period. Evans was the Nokes' foster child for five and a half years, living with the Nokes about three-fourths of the time during that period. He had a bedroom at the Nokes' house where he kept his clothes, toys, and personal belongings. As foster parents, the Nokes performed general parenting duties, including feeding, clothing, sheltering, supervising, and disciplining Evans, and they were responsible for taking him to school and counseling and doctor visits. In fact, Evans – who lived with the Nokes from ages nine to fifteen and had documented mental health issues – was totally dependent on the Nokes' care. *See Shockley*, 793 F.Supp. at 857 (children were "residents" under their great aunt's insurance policy during their eight week stay because the children "were completely dependent upon Edith for food, clothing, medicine, shelter, and parental care."); *Imel*, 817 N.E.2d at 305 (finding minor resided with his primary caregiver). This demonstrates that the parties intended Evans to reside with the Nokes. *Shockley*, 793 F.Supp. at 857. Based on the above, Evans clearly maintained a physical presence in the Nokes' house, as Evans and the Nokes intended, and he had sufficient access to the house to demonstrate his residency.

The Defendants arguments to the contrary are unpersuasive. First, that Evans did not reside with the Nokes throughout the entire five and a half year period, sometimes staying with his biological mother on weekends, is of no matter – the above conditions sufficiently demonstrate that Evans continuously maintained a fixed, rather than transient abode at the Nokes' house while he was their foster child. *See Neumann*, 435 N.E.2d at 593; *see Aetna Cas. & Sur. Co. v. Crafton*, 551 N.E.2d 893, 896 (Ind. App. 1990) (finding that a minor resided with his father despite "sporadic and irregular" weekend visits with his mother). In addition, the fact

that, as a foster child, Evans remained a ward of the State of Indiana, and the State maintained control over many of the Nokes' parental decisions, does not change the fact that Evans resided in the Nokes' house. *See Lawrence*, 2010 WL 4386780, at *4-5 (foster child staying with foster parents for a little over two months classified as a resident under insurance policy); *Merchants Mutual Ins. Co. v. Artis*, 907 F.Supp. 886, 890 (E.D. Pa. 1995) (the State's legal custody of foster child irrelevant to residency). This is especially true because Evans was almost entirely dependent on the Nokes for his daily care. *See Shockley*, 793 F.Supp. at 857.

In sum, for over five years, Evans continually lived in the Nokes' home. Occasional or sporadic visits to his biological mom's home did not change his residence anymore than if he went on weekend trips to his grandma's house or trips to summer camp. As a result, based on the totality of the circumstances, it is clear that Evans was a resident of the Nokes' home under the State Farm policy.

The next issue is whether Evans was "in the care" of the Nokes. Similar to their arguments to defeat the residency requirement, the Defendants argue that Evans was not "in the care" of the Nokes because, as a ward of the State, Evans was in the care of the State of Indiana. The Defendants claim that the State controlled all of Evans' day to day activities, asserting "the Nokes could not do anything without seeking the State's approval." [DE 104 at 8.] Moreover, the Defendants note that all of the Nokes' foster children were considered temporary placements in the Nokes' home, and the State determined the length of time that the foster children lived in the Nokes' home. The Nokes analogize their role as foster parents to that of "glorified babysitters" or possibly, hotel-keeps. [DE 105-2 at 39:15-41:12.] So, according to the Defendants, because the Nokes had no control over Evans, and Evans was the legal

responsibility of the State, at the very least, a question of fact exists as to whether he was in the Nokes' care.

Notably, the parties do not argue that the phrase "in the care" is ambiguous.[2] Indeed, courts that have analyzed the phrase have found it unambiguous, assigning the phrase its plain, ordinary, and common meaning. *See, e.g., State Farm Fire and Cas. Co. v. Odom*, 799 F.2d 247, 250 (6th Cir. 1986); *Olivia v. Vermont Mut. Ins. Co.*, 842 A.2d 92, 95 (N.H. 2004); *Henderson v. State Farm Fire and Casualty Co.*, 596 N.W.2d 190, 195-96 (Mich. 1999); *State Farm Fire and Cas. Co. v. Breazell*, 478 S.E.2d 831, 833 (S.C. 1996); *Mitsock v. Erie Ins. Exchange*, 909 A.2d 828, 833 (Pa. Sup. 2006); *Priest v. Roncone*, 851 A.2d 751, 755 (N.J. Sup. 2004); *Cierzan ex rel. Weis v. Kriegel*, 655 N.W.2d 217, 221 (Wis. App. 2002); *see also Artis*, 907 F.Supp. at 890. Consistent with these findings, and because the parties do not contest the issue, I do not believe reasonable people would honestly differ as to the meaning of the phrase, *Am. Family*, 774 N.E.2d at 935, and I apply "in the care" pursuant to its plain and ordinary meaning.

In applying "in the care" to these facts, the parties suggest that I adopt the list of eight factors set forth by the Michigan Supreme Court in *Henderson v. State Farm Fire and Casualty Co*. 596 N.W.2d at 195-96. Indeed, other courts that have analyzed the phrase have relied on *Henderson's* non-exclusive, common sense list of factors. *See Oliva,* 842 A.2d at 95-96; *Priest,* 851 A.2d at 755-56; *Cierzan,* 655 N.W.2d at 221-22; *Mitsock*, 909 A.2d at 834. These factors consider: (1) is there a legal responsibility to care for the person; (2) is there some form of

---

[2] Davis off-handedly claims the meaning of "in the care" is "elusive," however, he provides no argument or support demonstrating why this is so. As a result, I disregard this assertion. *See Mathis v. New York Life Ins. Co.*, 133 F.3d 546, 548 (7th Cir. 1998) (per curiam) (undeveloped arguments are waived).

dependency (e.g., food, clothing, shelter, transportation); (3) is there a supervisory or disciplinary responsibility; (4) is the person providing the care providing substantial essential financial support; (5) is the living arrangement temporary or permanent, including how long it has been in existence and is expected to continue; (6) what is the age of the person allegedly "in the care" of another; (7) what is the mental or physical health status of the person allegedly "in the care" of another; and (8) is the person allegedly "in the care" of another gainfully employed. *Henderson*, 596 N.W.2d at 195-96.

Considering these factors, and a common understanding of the phrase (not to mention common sense), Evans was clearly in the care of the Nokes. First, the Nokes had a legal responsibility to care for Evans. By definition, a "foster parent" is "an individual who provides *care* and supervision to a child." Ind. Code § 31-9-2-47 (emphasis added). As noted above, these responsibilities included feeding, clothing, sheltering, supervising, and disciplining Evans. In fact, given Evans' age and capacity, he was completely dependent on the Nokes for his care during the five plus years he was the Nokes' foster child. The Nokes admitted as much in their discovery responses. [*See* DE 102-10 (Nokes Requests for Admissions ¶ 5) (admitting Evans was in their care); DE 102-11 at 23:10-12 (P. Nokes Dep.) ("Q: Were all three of them (Nokes, Phelps, and Davis) *in your care* during that period? A: Yes, they were.") (emphasis added).]

Moreover, while the State supported the Nokes financially, as it does all foster parents, the Nokes spent more on Evans than they received from the State. [DE 111-2 at 18:23-19:1 (D. Nokes Dep).] And, contrary to the Defendants' claim, while the State of Indiana retained legal custody of Evans and dictated some of the ways in which the Nokes cared for Evans, this does not alter the outcome. *See Odom*, 799 F.2d at 250 ("in the care" "cannot be reasonably

understood to mean only legal care" but instead "includes legal *and* physical care") (emphasis in original); *Artis*, 907 F.Supp. at 890 (holding that foster children were in the care of their foster parents rather than the State, noting "we are not concerned with which person or entity had legal custody of the children"); *see also Mitsock*, 909 A.2d at 834 (finding "*Henderson's* first factor should almost always be dispositive and result in a finding that the individual is 'in the care' of the insured, as long as the insured provides financial support (factor 4) or the basic necessities of life (factor 2)."). As a result, Evans was in the Nokes' care during the five and a half years he was their foster child.

To sum up: Evans was a resident of the Nokes' home, under the age of 21, and in the Nokes' care. Therefore, he was an insured under the policy. Because the State Farm policy explicitly excludes coverage for injuries to an insured, State Farm has no duty to defend or indemnify anyone for the matters raised in Evans' state court complaint.[3]

**B.    No Waiver or Estoppel**

Notwithstanding any policy exclusions, the Defendants claim that State Farm waived or is estopped from denying coverage for Evans' injuries because of statements made by State Farm representatives to the Nokes about their future coverage. The alleged statements were made during the mediation of an unrelated but similar incident in which a young girl, M.N., brought suit against the Nokes after being sexually abused by one of the Nokes' foster children. M.N. was a visitor to the Nokes' home and thus – unlike Evans – she was not an "insured" under the

---

[3] State Farm also argues the abuse was intentional, and is thus not an "occurrence" under the policy and must be excluded as an "expected or intended" act of an insured. In addition, it claims that any punitive damages are not insured. Because I find that Evans' injuries are not covered by the policy because he was an insured, I need not reach these arguments.

policy. So State Farm defended the Nokes in M.N.'s subsequent lawsuit and eventually paid to settle the claim. In an August 25, 2009 affidavit, the Nokes testified that State Farm representatives assured them at the mediation that their policy would not be cancelled because of M.N.'s claims, and State Farm would continue to cover the Nokes pursuant to the policy, which it did. [*See* DE 111-10 ¶ 6 (Nokes Aug. 25, 2009 Aff.).] Similarly, Donald Nokes testified at his July 20, 2010 deposition:

> Q. You were asked in the interrogatories – well, you also stated that one of the reasons why you thought you should have coverage in this case, in Nathan Evans' case, was because State Farm had paid to settle the [M.N.] claim. Does that sound familiar to you?
>
> A. Yes, it does. During the [mediation], there were two people from State Farm, a man and a woman who had come down from Michigan. And I remember specifically asking them if we were going to be cancelled or not covered because of this, and they assured me that they would be (sic).
>
> Q. You asked them what?
>
> A. I asked them if State Farm would cancel us or not cover us anymore on stuff, you know. And I was told that they would cover us and that – let me see how they put it. Oh, I can't remember exactly how the gentleman put it, but it was to the fact that we would be covered.
>
> Q. Your concern was that your policy would be cancelled because you had such a significant claim?
>
> A. Right.
>
> . . . .
>
> Q. And during the [M.N.] case, there were some issues that other children had been molested in your care while – no. There were other children that were molested while in the foster home, do you remember that? Do you recall a video that I presented?
>
> A. Yes.
>
> Q. And that other children said that they had been molested?

> A. I don't remember the contents of that video.
>
> Q. But do you recall anything that you took out of that video that there may be other claims rising?
>
> A. I don't remember that I took anything like that out of there.
>
> Q. Okay. But you did ask whether there would be coverage for future claims; correct?
>
> A. I had asked that before we saw the video because I was concerned that – I had all my insurance, my house, my cars, everything was with State Farm. And were they going to drop me and was I going to have to go and find another insurance company? Or would they continue to cover us, you know, for everything that was coming up, if anything was coming up? You know, an accident or if – you know, that type of thing here, what have you.
>
> Q. Also, you were still foster parents, so you were also concerned whether other foster children had been molested at that time and if there were going to be future lawsuits; correct?
>
> A. I don't remember if that was my concern, but I was concerned with making sure we had – we were insured at the time I talked to these people.

[DE 111-2 at 9:4-25; 105-2 at 30:15-31:21.] Donald Nokes testified that he did not remember having any other conversations with State Farm about future coverage. [DE 105-2 at 11:13-23.] Patricia Nokes testified at her deposition that she did not recall discussing their future coverage with State Farm representatives. [DE 111-1 at 15:25-16:3.]

Then, in a November 5, 2010 affidavit, dated after State Farm moved for summary judgment, both Donald and Patricia Nokes changed their story in a nuanced but important way. They alleged that at the mediation State Farm "told us that if a claim like [M.N.'s] happened again, State Farm would insure us and that was why we kept insurance with State Farm." [DE 103 ¶ 7.] According to the Nokes, based on this assurance, they did not purchase additional insurance and they were unable to hire their own attorney to defend against Evans' claim. [*Id*. ¶¶

8-11.] So, they argue, State Farm may not now deny coverage for Evans' claims.

First off, I must address the discrepancy between the August 25, 2009 affidavit and the Nokes' July 20, 2010 deposition testimony, on the one hand, and the November 5, 2010 affidavit, on the other. As the above quotes indicate, Donald Nokes testified at his deposition, "I can't remember exactly how the gentleman put it, but it was to the fact that we would be covered" going forward [DE 111-2 at 9:20-22], which is in accord with the Nokes' August 25, 2009 affidavit. He testified that the Nokes were concerned that their multiple State Farm policies would be cancelled as a result of M.N.'s claims, and went on to state "I don't remember" being concerned about future lawsuits regarding molestation by his foster children. [DE 105-2 at 31:15-21.] Donald Nokes also did not remember having any other conversations with State Farm about their future coverage, and, in fact, Patricia Nokes could not recall any discussion with State Farm representatives regarding their policy, notwithstanding the August 25, 2009 affidavit.

The Nokes' November 5, 2010 affidavit, however – which was filed in response to State Farm's motion for summary judgment – coincidentally added an important statement to the Nokes' previous testimony. The Nokes' new testimony was that State Farm promised at the mediation to insure the Nokes "if a claim like M.N.'s happened again." [DE 103 ¶ 7.] This is materially different than merely stating – as they did in their earlier affidavit and depositions – that they were concerned about having their policy cancelled and State Farm assuring them that it would not. Instead their new testimony as fleshed out in the recent affidavit suggests that State Farm promised to insure the Nokes for any future sex abuse claims concerning their foster children. The two are obviously quite different – the promise to not cancel coverage, on the one

-13-

hand, with promising to cover all future claims of sex abuse, on the other.

The Seventh Circuit is "highly critical of efforts to patch up a party's deposition with his or her own subsequent affidavit." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995) (collecting cases and noting that almost all affidavits are drafted by attorneys, not affiants). "The concern in litigation, of course, is that a party will first admit no knowledge of a fact but will later come up with a specific recollection that would override the earlier admission." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996); *see also Unterreiner v. Volkswagen of American, Inc.,* 8 F.3d 1206, 1210 (7th Cir. 1993) ("A party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject."). It is thus well-settled that while a subsequent affidavit may clarify ambiguous or confusing deposition testimony, if a party fails to explain a conflict between a deposition and subsequent affidavit, the contradictory affidavit may not create a genuine issue of material fact. *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1297 (7th Cir. 1993).

Here, the Nokes fail to explain why their deposition testimony and earlier affidavit, all of which lack details about their conversation with State Farm aside from noting that State Farm promised not to drop their coverage altogether, conflict with their more specific affidavit filed in response to State Farm's motion for summary judgment. As a result, I find the Nokes' testimony in the November 5, 2010 affidavit regarding State Farm's representations to the Nokes inadmissible. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001) (affidavit inadmissible where party provided no acceptable explanation for the discrepancy between affidavit and prior deposition testimony); *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998) (affirming district court's decision to strike affidavit where the affidavit reported

incidents of sexual harassment and the plaintiff previously had testified that she "[could] not recall any incidents of harassment"); *Darnell v. Target Stores*, 16 F.3d 174, 176-77 (7th Cir. 1994) (disregarding subsequent affidavit because it was more specific than deposition).

With this preliminary issue out of the way, I will now move on to the Defendants' estoppel and waiver arguments. The Defendants asserts that promissory estoppel, equitable estoppel, or waiver prevents State Farm from denying the Nokes coverage for Evans' claim. Promissory estoppel occurs when: (1) a promise by the promissor; (2) is made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise. *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001). A party claiming equitable estoppel must show its "lack of knowledge and of the means of knowledge as to the facts in question, reliance upon the conduct of the party estopped, and action based thereon of such a character as to change his position prejudicially." *Money Store Inv. Corp. v. Summers*, 849 N.E.2d 544, 547 (Ind. 2006); *Rager v. Dad Behring, Inc.*, 210 F.3d 776, 779 (7th Cir. 2000) (equitable estoppel requires both actual and reasonable reliance). Waiver is similar but distinct from estoppel and is defined as the voluntary and intentional relinquishment of a known right, claim, or privilege. *Tate v. Secura Ins.*, 587 N.E.2d 665, 671 (Ind. 1992).

The Defendants' estoppel arguments fail. First, the Defendants overstate the significance of the statements made by the State Farm representatives. According to Donald Nokes' deposition and the Nokes' August 25, 2009 affidavit, State Farm told the Nokes at the mediation that it would continue to provide coverage under the Nokes' policy after the M.N. case was resolved. And indeed, it did. The Defendants argue that based on this, State Farm is estopped

from denying coverage for Evans' claims. But it does not follow that by defending the Nokes in the M.N. case and promising to cover the Nokes thereafter (fairly unremarkable in itself), that State Farm obligated itself to cover the Nokes for *any future* sex abuse claim brought against one of the Nokes' foster children, even if the claim otherwise fell outside the Nokes' policy. Recall that M.N. was not a resident of the Nokes' house, and thus not an "insured" under the Nokes' State Farm policy. So Mr. and Mrs. Nokes could not possibly believe that State Farm intended to waive an exclusion in the Nokes policy that was not at issue in M.N.'s case – the exclusion for injuries to insureds.

Promising not to drop the Nokes' coverage is very different than promising to cover the Nokes for specific types of future incidents. As a matter of law, the Defendants' reliance on such an interpretation of State Farm's statements was patently unreasonable. *See Biberstine v. N.Y. Blower Co.,* 625 N.E.2d 1308, 1316 (Ind. App. 1994) ("[W]here the evidence is so clear as to be susceptible of only one reasonable inference, it is for the court to determine as a matter of law whether plaintiff was justified in relying on the representation."); *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 705 (7th Cir. 2004) (same) (applying Indiana law).

For similar reasons, the Nokes' waiver argument has no merit. State Farm's assurance that it would continue covering the Nokes following M.N.'s claim does not remotely suggest that State Farm intended to waive its right to deny coverage for unrelated future claims, and in particular those claims that would otherwise fall outside of the policy's coverage. *See City of Crown Point v. Misty Woods Properties, LLC*, 864 N.E.2d 1069, 1079 (Ind. App. 2007) (waiver "requir[es] both knowledge of the existence of the right and intention to relinquish it"). As a result, the Nokes' waiver argument also fails as a matter of law. *Jackson v. DeFabis,* 553 N.E.2d

1212, 1217 (Ind. App. 1990) (holding question of waiver proper for summary judgment because action of party was not disputed, and only the inference and legal conclusions to be drawn from the facts were argued).

## CONCLUSION

For the foregoing reasons, State Farm's Motion for Summary Judgment is **GRANTED**. [DE 100.] Accordingly, because Nathan Evans was an "insured" under the Nokes' State Farm homeowner's insurance policy in effect during the relevant period, pursuant to the policy, State Farm has no duty to defend or indemnify the Nokes or any other insured, and no duty to any other defendant in this action, for the claims asserted by Nathan Evans in the state court complaint at issue here, including any claims for punitive damages.

**SO ORDERED**.

ENTERED: March 2, 2011.

s/ Philip P. Simon  
PHILIP P. SIMON, CHIEF JUDGE  
UNITED STATES DISTRICT COURT